Highland *v.* Commonwealth, Appellant.

262

Argued November 13, 1959. Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN and BOK, JJ.

reargument refused June 27, 1960.

*S. C. Pugliese,* with him *Paul B. Griener* and *Carl A. Belin,* for appellants.

*Robert V. Maine,* for appellant.

*John A. Metz, Jr.,* with him *Dan P. Arnold, B. R. Coppolo, Joseph B. Mitinger,* and *Chaplin & Arnold,* and *Driscoll, Gregory & Coppolo,* and *Metz, Cook, Hanna & Kelly,* for appellants.

*F. Cortez Bell, Jr.,* with him *Richard Bennett Gordon,* and *Bell, Silberblatt & Swoope,* for appellant.

*Robert C. Derrick,* Assistant Attorney General, with him *Eugene G. Kitko, John Sullivan,* Deputy Attorney General, and *Anne X. Alpern,* Attorney General, for Commonwealth, appellant.

*Joseph J. Lee,* with him *Clarence R. Kramer,* for appellees.

*William H. Eckert,* for interested person, under Rule 46.

OPINION BY MR. JUSTICE BENJAMIN R. JONES, April 18, 1960:

The basic issue presented by these seven appeals concerns the ownership of the right to the natural gas underlying four parcels—approximately 3784 acres—

of land situated in Huston Township, Clearfield County. The determination of this issue rests largely upon the construction and interpretation of the provisions of seven deeds and an examination of several judicial proceedings which resulted in the execution of two of these deeds.

On June 25, 1900, I. F. Richey et al., trustees of the Caledonia Coal Company, conveyed, inter alia, to one N. T. Arnold these four parcels of land—herein known as Parcels 1, 2, 3 and 4*—said parcels being described as "tracts", "parcels" or "pieces" of land. *In addition to these four parcels of land,* this deed (herein termed the *Richey* deed) purported to convey: (1) "All the coal, coal oil, fire clay and other minerals of every kind and character in, upon and under" 15 described tracts of land; (2) "All the coal, coal oil, fire clay and other minerals of whatever nature or character" under 8 described tracts of land; (3) several other tracts of land. At the end of the descriptive portions of this deed the following appeared: "It is the intention of [Richey et al.] to convey . . . all the land, coal, coal oil, fire clay, *natural gas,* and other minerals and all rights vested in [Richey et al.] [under a certain prior deed]. . . . Together with the right and privilege of entering upon such lands as are not conveyed . . . and taking away said coal, coal oil, *natural gas,* fire clay and other minerals of every kind and character . . . and to do . . . such . . . things thereon in such manner as may be necessary in the judgment of [Arnold] to successfully mine and take away said coal, coal oil, *natural gas,* fire clay and other minerals, . . . .". (Emphasis supplied). It is conceded by all parties to this litigation that, by the *Richey* deed—

---

* The ownership of gas rights under Parcel No. 3 has been withdrawn from consideration on this appeal and, therefore, the adjudication herein rendered does not determine the ownership of the gas rights under Parcel No. 3.

the common source of title of all the present litigants —, title to all the natural gas rights under these four parcels of land became vested in Arnold.

On the same date as the *Richey* deed, Arnold and his wife made a conveyance to John Byrne, trustee for one Frank Byrne and one Frank Smith, the said John Byrne being empowered to explore for "coal and other minerals" and "to mine, take and carry away the same", to sell or lease the said lands and mineral rights, to pay the taxes and protect the "lands and minerals" and to mortgage the "lands, coal and minerals" to secure [Arnold] the purchase money or develop the property. Under the provisions of this deed (herein termed the *Byrne* deed) Arnold and his wife conveyed: "All the coal, fire clay, limestone, iron ore and other minerals" in and under certain land in Huston Township, Clearfield County, said land being described by metes and bounds. In the *Byrne* deed between the descriptive and habendum clauses appeared the following: "TOGETHER with all and singular the ways, water, water courses, mining rights, minerals, rights of way, rights, liberties, privileges, and appurtenances whatsoever thereunto belonging or in any way appertaining and the reversions, remainders, rents, issues and profits thereof, and all the estate, right, title, interest, property, claim and demand of [Arnold] . . . in law, equity or otherwise howsoever, of and to the same and every part thereof with the right and privilege of entering upon said land and taking away said *coal, fire clay, iron-ore, lime-stone and other minerals* hereby conveyed and to erect such structures, ways, buildings, railways and shafts thereon both up and down, to cut and fill the surface wherever needed for railways for such purposes, and to dig ditches and channels for waste water and to do those and such other things thereon in such manner as may be necessary in the Judgment of [John Byrne] and to carefully mine and

take away such *coal, fire clay, lime stone, iron ore and other minerals* or any of them from the lands aforesaid." (Emphasis supplied). In this deed Parcels 1 and 4 constitute the overlying land.

On July 30, 1900, Arnold and his wife conveyed by deed (herein termed the *Hall-Kaul* deed) to one J. K. P. Hall and one Andrew Kaul "all the coal, iron ore, lime stone, fire clay and other minerals" under a certain tract of land, "All the Coal, Coal Oil, and other minerals of every kind and Character" under another tract of land; "All the Coal, Coal Oil and all other minerals of every kind and character" under several other tracts of land; "All the coal, fire clay, iron-ore and other minerals" under another separate tract of land and "All the coal, and minerals" under still another separate tract of land. Following the descriptive clauses in this deed appeared the following: "To-GETHER with right and privilege of entering upon said lands and taking away said *coal, coal oil, fireclay and other minerals of every kind and character,* and to erect such structures, ways, buildings, tramways and shafts thereon both up and down, to cut and fill the surface wherever needed for railways for such purposes, and to dig ditches and chanels for waste water, and to do those and such other things thereon in such manner as may be necessary in the Judgment of [Hall-Kaul], to successfully mine and take away said *coal, iron ore, fire clay and other minerals or any of them* from the lands aforesaid." (Emphasis supplied). This deed includes the overlying land known as Parcels 2 and 3.

*All* the rights conveyed in the *Byrne* and *Hall-Kaul* deeds have now, by subsequent conveyances, become vested in the present appellants known as the New

---

[1] This group is composed of New Shawmut Mining Company, S. C. Pugliese et ux., A. J. Palumbo et ux., and Devonian Gas and Oil Company.

Shawmut group,[1] a group which now claims all the natural gas rights under the four parcels of land.

Arnold died August 4, 1906, a resident of Elk County. Under his will—dated February 4, 1901—he gave his entire estate to certain trustees to hold, initially, for the benefit of his wife and three children and, ultimately, of the Methodist Episcopal Church. Under this will Arnold gave no authority to his executors to deal with his realty and instructed his trustees, inter alia: "Neither shall any property be sold or leased for the production of coal, oil, gas or minerals without the written consent and approval of each and every Trustee, of whom there shall not be less than three capable of transacting business at all times".[2]

At the time of his death Arnold was heavily indebted. At the instance of creditors, the Orphans' Court of Elk County on February 10, 1909 directed his executors to seek court permission for the sale of Arnold's realty for the payment of debts. On February 26, 1909, the executors petitioned that court for permission to sell, at private sale, all Arnold's realty in Elk County for $48,000 for the payment of his debts and for authority to raise $152,000 from Arnold's realty situated in Clearfield County (as described in Schedule "C" attached to the petition) "for the purpose of paying the balance of the debts which are liens against the real estate of [Arnold]". In Schedule "C" were metes and bounds descriptions prefaced: "Surface only". On that same date the Orphans' Court of Elk County authorized the sale of Arnold's Elk County property for $48,000 and authorized the executors to raise $152,000 from Arnold's Clearfield County realty. On March 8,

---

[2] The will also provided: "Royalties from mines or other sources, including oil and gas wells, whether now being worked or opened under a contract with my Trustees, shall be treated as income and not as real estate".

1909 the executors asked the Orphans' Court of Clearfield County for permission "To sell all of said land situate in [Clearfield County] described in Schedule "C"" for $152,000 and that court granted such permission. On May 27, 1909 the executors reported to that court the sale at private sale of all Arnold's real estate in Clearfield County for $152,000 to one B. F. Thompson and that court confirmed the sale.

On May 31, 1909 Arnold's executors made a conveyance to B. F. Thompson. By its provisions, this deed (herein termed the *Arnold Executors'* deed) conveyed, inter alia, to Thompson the "Surface only" of certain tracts of land in Clearfield County described by "metes and bounds", descriptions inclusive of Parcels 1, 2, 3, and 4. This deed conveyed items of realty numbered I-IX, inclusive, and the following prefatory language appeared before "metes and bounds" descriptions of several of the items: Item I, "All the coal, coal oil, fire clay, and other minerals of every kind and character in, upon and under the following described tracts of land": Item II, "All the minerals, coal, fire clay, iron ore, oil, gas and other kinds whatsoever . . . in, upon and under" certain described land: Item III, "The undivided 2/5ths interest in all the coal, coal oil, fire clay and other minerals of every kind and character in, upon and under" certain described tracts of land. Items VI, VII, VIII and IX, which included Parcels 1, 2, 3 and 4, were prefaced "Surface only". Between the descriptive and habendum clauses appeared: "Together with the right and privilege of entering upon such lands as are *not* conveyed and being described herein and taking away said coal, coal oil, *natural gas,* fire clay and other minerals of every kind and character, and to erect such structures, ways, buildings, railways, and shafts thereon both up and down, to cut and fill the surface wherever needed for railways for such purposes and to dig ditches and chan-

nels for waste water, and to do these and such other things thereon in such manner as may be necessary in the judgment of [Thompson], to successfully mine and take away said coal, coal oil, *natural gas,* fire clay and other minerals, or any part of them from the lands aforesaid without liability for damages which may be incurred to the surface of the said lands, or anything thereon or thereunder; and with the right to use such timber as was reserved to [Arnold] or in him in anyway vested; so fully as the same were granted and conveyed to [Arnold], and so far as [Arnold] was seized at the time of his death." (Emphasis supplied). The Arnold group of claimants[3] contend that the *Arnold Executors'* deed did not convey any of the natural gas rights under Parcels 1, 2, 3 and 4.

On February 23, 1910, Thompson and his wife conveyed to Penfield Coal & Coke Company (herein called Penfield), interests in certain realty, Items IV, V, VI and VII of which conveyances are presently relevant. This deed (herein termed the *Thompson-Penfield* deed) conveyed: "All of the surface of all that certain tract of land situate in Huston Township, Clearfield County . . ." of Items IV to VII, inclusive,—covering Parcels 1, 2, 3 and 4—and the pertinent descriptions in that deed correspond exactly with the pertinent descriptions in the *Arnold Executors'* deed. In this deed between the descriptive and the habendum clauses appears: "TOGETHER with the right and privilege of entering upon the lands hereinabove described and taking away said coal, coal oil, *natural gas,* fire clay and other minerals of every kind and character, and to erect such struc-

---

[3] Included in the Arnold group are Ridgeway National Bank, Bruce Isaacson and John Bell, successor trustees under Arnold's will, the New Shawmut Mining Company (by virtue of a deed from Arnold's trustees to said company on *April 4, 1958*) and New York State Natural Gas Company, the latter the purchaser of the gas being produced by Devonian Gas and Oil Company.

tures, ways, buildings, railways and shafts thereon, both up and down, to cut and fill the surface wherever needed for railways for such purpose, and to dig ditches and channels for waste water, and to do these and such other things thereon in such manner as may be necessary in the judgment of the said party of the second part, its successors and assigns, to successfully mine and take away said coal, coal oil, *natural gas,* fire clay and other minerals or any part of them, from the lands aforesaid, without liability for damages which may be incurred to the surface of the said lands or anything thereon or thereunder; and with the right to use such timber as was reserved to [Arnold] or in him in any way vested as fully as the same were granted and conveyed to [Arnold], and so far as [Arnold] was seized at the time of his death." (Emphasis supplied).

On April 14, 1911, Arnold's trustees gave a quitclaim deed to Penfield which recited, inter alia: "AND WHEREAS owing to certain alleged informalities in the descriptions of the lands hereinafter set forth, it is the desire of the Estate of the said N. T. Arnold to cure any and all defects or alleged defects in the Deed from the said Executors to the said B. F. Thompson above mentioned so as to vest all the estate of the said N. T. Arnold in said lands in the party of the second part hereto." This deed (herein termed the *Penfield-Quitclaim* deed) purported to "release and quitclaim to [Penfield] all the interest of [Arnold] in those certain pieces, parcels and tracts of land situate in [Huston Township, Clearfield County]" and contained four descriptions by "metes and bounds" of Parcels 1, 2, 3 and 4. A comparison of the *Arnold Executors'* and the *Thompson-Penfield* deeds with the *Penfield Quitclaim* deed reveals certain variations. The latter deed contains a description of four tracts of land which are Items IV, V, VI and VII of the *Thompson-Penfield* deed and Items VI, VII, VIII and IX of the *Arnold*

*Executors'* deed. The "metes and bounds" description of the first two tracts of land in the *Penfield Quitclaim* deed substantially differ from the description in the *Arnold Executors'* deed and the *Thompson-Penfield* deeds; the description of the last two tracts of land in the former deed vary from the latter deeds in that in the *Penfield-Quitclaim* deed the recital clauses of the descriptions contained in the *Arnold Executors'* and *Thompson-Penfield* deeds are omitted; lastly, the prefatory clauses in the *Arnold Executors'* and the *Thompson-Quitclaim* deeds limiting the terms of the conveyance of all four tracts of land to "surface only" are omitted from the descriptions in the *Penfield Quitclaim* deed.

In 1926 the U. S. District Court for the Western District of Pennsylvania appointed one L. W. Smith as receiver for Penfield which was in serious financial difficulties.[4] Being unable to operate Penfield successfully because of the lack of working capital and the poor quality of its coal, Smith petitioned the U. S. Court for permission to sell at public auction 3784.35 acres (the land in controversy) of "wild surface land in fee but without mineral rights". In the receiver's petition it was averred, inter alia: (1) "The Receiver can see no prospect for any sale of these holdings in the future as coal properties, though possibly recent gas and oil development in the northern central part [of Pennsylvania] may make some market, though the lands belonging to [Penfield] have never been tested or proved for oil or gas"; (2) "among the real estate owned by [Penfield] there are about 3784.35 acres of wild surface land without mineral rights which [Pen-

---

[4] On March 1, 1910 Penfield had entered into a mortgage to secure an issue of bonds with the Guarantee Title & Trust Co. of Pittsburgh. At the time of the receivership there were outstanding bonds of a par value of $518,000 and unpaid interest from September 1, 1923.

field] owns in fee . . . ."; (3) that the Commonwealth of Pennsylvania, Department of Forests and Waters "is desirous of acquiring the said surface lands and has offered to pay therefor the sum of $2.90 per acre or a total of $10,974.61". The U. S. Court directed the property be advertised for sale, the sale was held and was later confirmed by that court. On July 22, 1931, Smith, as receiver, by a deed (herein called *Commonwealth* deed) conveyed Parcels 1, 2, 3 and 4 to the Commonwealth, and the Commonwealth has for over 28 years been in possession of said parcels.

It is Penfield's contention that, by virtue of the *Arnold Executors'* deed, the *Thompson-Penfield* deed and the *Penfield Quitclaim* deed, it became vested with all Arnold's rights to the natural gas under the instant land and that, by the *Commonwealth* deed, it conveyed to the Commonwealth only the surface and not the gas rights thereunder. On the other hand, the Commonwealth contends that not only did Penfield receive Arnold's natural gas rights under the instant land, but that, by the *Commonwealth* deed, Penfield conveyed all such natural gas rights to the Commonwealth.

On December 31, 1957—26 years subsequent to the *Commonwealth* deed—Cecil B. Highland, Jr., appointed by the Court of Common Pleas of Clearfield County as trustee for Penfield for the purpose, inter alia, of ascertaining the amount of land, minerals, gas and oil rights, if any, still owned by Penfield, and E. C. Metzner to whom Highland, with the court's permission, had granted an oil and gas lease, instituted in the Court of Common Pleas of Clearfield County an action to quiet title. This action was originally instituted only against the Commonwealth of Pennsylvania; on the instance of the Commonwealth, all of the present appellants, with the exception of the New York State Natural Gas Company which intervened, were joined

as defendants in this action. The court of Common Pleas of Clearfield County found that Highland, trustee, and Metzner, i.e., the Penfield claimants, had title to all the natural gas rights under the land in controversy. Exceptions taken to this decree nisi were dismissed and a final decree entered from which these seven appeals were taken.

In summary, there are four separate groups which claim title to the natural gas rights under Parcels 1, 2, 3 and 4; (1) the Shawmut group which claims such title by virtue of the *Byrne* and *Hall-Kaul* deeds; (2) the Arnold group which takes the position that neither Arnold, by the *Byrne* or *Hall-Kaul* deeds, nor his executors, by the *Arnold Executors'* deed, nor his trustees, by the *Penfield Quitclaim* deed, relinquished Arnold's title to the natural gas rights and that such title still remains in the Arnold group; (3) the Penfield group which rests its title on the *Arnold Executors'*, the *Thompson-Penfield* and *Penfield Quitclaim* deeds and denies any divestiture of such title by the *Commonwealth* deed; (4) the Commonwealth of Pennsylvania which claims title by virtue of the *Commonwealth* deed.

Since, as hereinbefore stated, all parties concede that Arnold, by virtue of the *Richey* deed, received full title to *all* the natural gas rights, our initial inquiry is whether Arnold's title, either before or after his death, was conveyed to any third person or persons.

### The Byrne and Hall Kaul Deeds

Upon these two deeds the Shawmut group rests its claim and contends that the parties in both deeds—Arnold and wife, grantors, and Byrne, Hall and Kaul, grantees—fully intended to effect thereby a conveyance of the natural gas rights by the use of the words "other minerals" in both deeds, such intent being

shown by the language of both deeds, the surrounding circumstances and by events which occurred subsequent thereto, i.e., subsequent conveyances by Arnold's executors and trustees.

Eighty-seven years ago a *general* definition of the word "minerals" was approved by this Court: "The term 'minerals' embraces everything not of the mere surface, which is used for agricultural purposes; the granite of the mountain as well as metallic ores and fossils, are comprehended within it": *Griffin v. Fellows et al.,* 81* Pa. 114, 124. Thirty-three years later in *Silver v. Bush,* 213 Pa. 195, 197, 62 A. 832, we said: "This court has had rather frequent occasion to consider the word mineral, and to define its meaning in different connections. A number of cases are cited by appellant in which it has been decided that petroleum and natural gas are minerals. Of the fact that under the broad division of all matter into the three classes of animal, vegetable and mineral, petroleum and gas are minerals, there has never been any room for question, and even under some more restricted classifications the same result may be reached. But, on the other hand, it has also been held that in other connections they are not included under that term. There is no discrepancy in the cases. The variations in the scope of the word arise from the connection and application in which it is used. The crucial question . . . is what was the sense in which the parties used the word. Mineral is not per se a term of art or of trade, but of general language, and presumably is intended in the ordinary popular sense which it bears among English speaking people. It may in any particular case have a different meaning, more extensive or more restricted, but such different meaning should clearly appear as intended by the parties. . . . In the present case the question arises in respect to natural gas, the plaintiff claiming that it was included in the reservation of the

"minerals underlying" the land conveyed. Certainly such gas is a mineral in the broadest sense of the term, but no evidence was given or offered to show that the parties so understood or intended the word mineral, or even that it had acquired a usage in conveyancing which would include gas".

In *Dunham & Shortt v. Kirkpatrick*, 101 Pa. 36 (decided in 1882) this Court enunciated a rule of construction of the word "minerals" to be applied when determining the inclusion therein or the exclusion therefrom of natural gas or oil. This decision established a rule of property which was a recognized part of the law of this state when the *Byrne* and *Hall-Kaul* deeds were executed and is a rule upon which the validity of many titles has long since rested. The *Dunham* rule—the existence of which is conceded by the Shawmut group—is based upon the popular conception of the meaning of the word "minerals". The rule may be briefly stated: if, in connection with a conveyance of land, there is a reservation or an exception of "minerals" without any specific mention of natural gas or oil, a presumption, rebuttable in nature, arises that the word "minerals" was not intended by the parties to include natural gas or oil: *Dunham & Shortt v. Kirkpatrick*, supra; *Silver v. Bush*, supra; *Preston et al. v. South Penn Oil Company et al.*, 238 Pa. 301, 86 A. 203; *Bundy v. Myers*, 372 Pa. 583, 94 A. 2d 724. In *Preston*, supra (p. 304), Chief Justice FELL stated: "Dunham v. Kirkpatrick has been the law of this State for thirty years and very many titles to land rest upon it. It has become a rule of property and it will not be disturbed." Seven years ago in *Bundy*, supra, our present Chief Justice stated (p. 587): "Dunham v. Kirkpatrick has now been the law of this State for seventy years and is still no less a rule of property which is not to be disturbed". As a rule of property long recognized and relied upon, the *Dunham*

rule binds and controls this situation:[5] that the word "minerals" appears in a grant, rather than an exception or a reservation, in nowise alters the rule. To rebut the presumption established in *Dunham,* supra, that natural gas or oil is not included within the word "minerals" there must be clear and convincing evidence that the parties to the conveyance intended to include natural gas or oil within such word.

Shawmut argues that there is clear and convincing evidence of record that the parties in both the *Byrne* and *Hall-Kaul* deeds did intend to include natural gas within the term "minerals" and that the presumption has been rebutted. Shawmut's argument rests upon several premises: (1) the "statement of intention" clause in the *Richey* deed indicates that Richey et al., the grantors, and Arnold, the grantee, dealt with and recognized natural gas as a "mineral"; (2) inasmuch as the *Byrne* deed was made the same date and the *Hall-Kaul* deed a month later, it is to be presumed, in the absence of evidence to the contrary, that Arnold in the *Byrne* and *Hall-Kaul* deeds placed the same meaning on "minerals" therein as given that same word in the *Richey* deed, i.e., "minerals" should be given the same meaning in the deeds *from* Arnold as in the deed *to* him; (3) that the absence in the subsequent deeds *from* Arnold, his personal representatives or trustees to Thompson et al., of any specific reference to natural gas and the reference in such deeds to sur-

---

[5] "A rule of property long acquiesced in should not be overthrown except for compelling reasons of public policy or the imperative demands of justice": *Smith v. Glen Alden Coal Co. et al.,* 347 Pa. 290, 302, 32 A. 2d 227. See also: *Madden et al. v. Gosztonyi S. & T. Co.,* 331 Pa. 476, 491, 200 A. 624; *Davis v. Pennsylvania Co., etc.,* 337 Pa. 456, 464, 12 A. 2d 66; *Commonwealth v. Wucherer,* 351 Pa. 305, 308, 41 A. 2d 574; *Burtt Will,* 353 Pa. 217, 231, 44 A. 2d 670; *Borsch Estate,* 362, Pa. 581, 589, 67 A. 2d 119; *Malamed v. Sedelsky,* 367 Pa. 353, 359, 80 A. 2d 853.

face indicates that the parties acted upon the understanding that the *Byrne* and *Hall-Kaul* deeds had already divested Arnold of any ownership in the natural gas.

The opponents of the Shawmut claim: (1) the exclusion of the words "natural gas" in the *Byrne* and *Hall-Kaul* deeds from the detailed enumeration of the minerals therein conveyed, as contrasted with the specific inclusion of "natural gas" in the *Richey* deed, indicates an intent to exclude "natural gas" from the word "minerals"; (2) an examination of the *Byrne* and *Hall-Kaul* deeds reveals that the parties thereto were concerned not with natural gas but with coal; (3) the "rights-of-way" granted in the *Byrne* and *Hall-Kaul* deeds failed to mention such "rights-of-way" as were necessary for the extraction of natural gas; (4) by application of the rule of *ejusdem generis* it is evident that the parties intended by the use of the word "minerals" to convey only *hard* minerals of the same type and character as those which were enumerated; (5) presumptively the word "minerals" does not include natural gas and such presumption must control.

Starting out with the presumption that the word "minerals" does not include natural gas, is there of record any evidence, clear and convincing in quality, that the parties in the *Byrne* and *Hall-Kaul* deeds intended to include natural gas within the words "other minerals"? The mining of coal, not the recovery of natural gas, was the principal objective of the *Byrne* and *Hall-Kaul* conveyances; in fact, John Byrne's principal duties as trustee were in connection with the recovery of coal. Even in 1926—over a quarter of a century subsequent to these two deeds—this property had never been tested for natural gas or oil.[6] The *Richey*

---

[6] Cf: Petition of Penfield Receiver to the United States District Court in 1926.

deed and the *Byrne* deed were executed almost simultaneously; in the former deed the title to the natural gas was *expressly* conveyed while in the latter deed natural gas is not even mentioned. It is inconceivable that, if Arnold has intended to convey the title to the natural gas to Byrne and Hall-Kaul which he had received in the *Richey* deed, he would not have described the *Byrne* and *Hall-Kaul* conveyances in language similar to or identical with the language in the *Richey* deed. Of great significance in the interpretation of the parties' intent is the fact that the *Richey* deed expressly conveys natural gas rights yet the *Byrne* and *Hall-Kaul* deeds make no reference to such rights. For minerals—coal, fire clay, limestone and iron ore—are specifically mentioned in the *Byrne* deed; two minerals—coal and coal oil—are specifically mentioned in the *Hall-Kaul* deed; a study of the language in both deeds indicates a high degree of selectivity and precision of language and description to have been employed by Arnold, especially bearing in mind that he had but recently been *expressly* given the rights to the natural gas. Arnold's omission of natural gas, coupled with the variation in the delineation of the minerals expressly conveyed to Byrne and Hall-Kaul, indicates that Arnold did *not* intend to convey *all* the mineral rights he had received from Richey et al. Furthermore, application of the rule of *ejusdem generis* clearly indicates that the words "other minerals" was intended to include only minerals of the character or the type enumerated with particularity and natural gas is certainly not of such character or type.

The burden was upon the Shawmut group to show, by clear and convincing evidence, that the parties intended that natural gas be included within the term "other minerals". Neither the language of the deeds, the surrounding circumstances nor the subsequent conveyances made by Arnold and his successors in title

demonstrate such intent. Any implications which are to be gathered from the language of subsequent conveyances by Arnold and his successors in title as to what was intended in the *Byrne* and *Hall-Kaul* deeds are wholly negative and lacking entirely in the character of evidence envisioned by our courts as necessary to overthrow the well-established presumption. In the absence of any such evidence, the long recognized rule of property which presumes that natural gas is not a "mineral", whether the word "mineral" appears in a reservation, an exception or a grant, must control. The *Byrne* and *Hall-Kaul* deeds did not convey title to natural gas rights and the New Shawmut group, successors in title to Byrne and Hall-Kaul, has no title whatsoever to such rights.

### Arnold Group Plan

The Arnold group, taking the position that neither Arnold nor his personal representatives nor his trustees ever parted with the rights to the natural gas vested in Arnold by the *Richey* deed, argue: (1) that the *Byrne* and *Hall-Kaul* deeds conveyed no rights to natural gas; (2) that, under the law in 1909, Arnold's personal representatives were without any power to deal with his realty except as such power was granted by Arnold's will or by the Orphans' Court; (3) that Arnold's will granted to his personal representatives no such power, that the Orphans' Court did not authorize the sale of the natural gas rights and that Arnold's personal representatives had no authority to effect a sale of such rights; (4) that the *Penfield Quitclaim* deed simply corrected the description of the surface in the 1909 deed [*Arnold Executors'* deed] and did not effect a conveyance of the rights to the natural gas.

We have already expressed our opinion that the. *Byrne* and *Hall-Kaul* deeds did not convey the natural gas rights so that if there was any conveyance of such rights it took place subsequent to Arnold's death.

We are in full agreement with the position taken by the Arnold group that, under the terms of Arnold's will, his personal representatives were given no authority to deal with his realty and that, in the absence of any such testamentary authority, Arnold's personal representatives were without any authority to deal with his realty unless and until empowered to do so by a court of appropriate jurisdiction: *Kreise et al. v. Cartledge,* 262 Pa. 55, 104 A. 855; *Morrison's Estate,* 196 Pa. 80, 46 A. 257; *Herron, for use, etc. v. Stevenson et al.,* 259 Pa. 354, 102 A. 1049; *Kelley's Estate,* 297 Pa. 17, 146 A. 260; *Wolfe et al. v. Lewisburg T. & S. D. Co.,* 305 Pa. 583, 158 A. 567.

However, in the event that a decedent's debts could not be satisfied out of his personalty, then his realty could be utilized for such purpose by his personal representatives provided that compliance was had with certain statutory requirements: Section 20, Act of February 24, 1834, P. L. 70.[7]  Under that statute if the personalty of a decedent was insufficient to pay his just debts, it became the personal representative's duty to sell or mortgage, under the direction of the Orphans' Court, so much of the realty as was necessary to pay such debts. The procedure was prescribed in the Act of March 29, 1832, P. L. 190, §§32, 33, and the Act of May 9, 1889, P. L. 182, §1, the latter permitting the Orphans' Court to direct a private sale. With the Arnold group's contention that the *Arnold Executors'* deed was dependent for its validity upon the terms of the order of the Orphans' Court and that the sale which

---

[7] See also: Act of April 19, 1794, P. L. 143, §21.

such order effected was a judicial sale, subject to strict construction, we are in full accord.

Applying these principles to the instant factual situation, we find that, in accordance with §33 of the Act of 1832, supra, Arnold's executors exhibited to the court a "full and correct statement" of all Arnold's realty.

A reference to Schedule "C" [attached to the executors' petition for the sale], indicates that it was prefaced as a "full, correct statement of all the real estate of [Arnold] . . . which has come to the knowledge of his executors". The Arnold group now argues that the rights to the natural gas were never listed by Arold's personal representatives in the petition for sale, that no authority to sell such rights was requested and that no such authority was granted by the court.

Even though the descriptions of Parcels 1, 2, 3 and 4 were prefaced as "surface only", yet Arnold's personal representatives, both in their petition and attached schedule, did represent to the court that they had listed *all* of Arnold's interest in realty in Clearfield County. There can be no doubt, from an examination of the court proceedings which led up to the petition for sale and to the sale itself, that Arnold's personal representatives, in order to liquidate his indebtedness, fully intended to sell *all* of Arnold's interest in realty in Clearfield County of whatever nature and there is no suggestion, expressed or implied, that there was to be a severance of the natural gas rights from the realty.

In *Arnold Executors'* deed, after a description of the various properties, the following appeared: "Together with the right and privilege of entering upon such lands as are not conveyed and being described herein and taking away said coal, coal oil, *natural gas,* fire clay and other minerals of every kind and character, and to erect such structures, ways, buildings, railways, and shafts thereon both up and down, to cut and fill the

surface wherever needed for railways for such purposes and to dig ditches and channels for waste water, to do these and such other things thereon in such a manner as may be necessary in the judgment of [Thompson], to successfully mine and take away said coal, coal oil, natural gas, fire clay and other minerals, or any part of them from the lands aforesaid without liability for damages which may be incurred to the surface of the said lands, or anything thereon or thereunder; and with the right to use such timber as was reserved to [Arnold] or in him in anyway vested; *so fully as the same were granted and conveyed to* [Arnold], and so far as [Arnold] was seized at the time of his death." (Emphasis supplied).

In *Brookbank v. Benedum-Trees Oil Company,* 389 Pa. 151, 157, 131 A. 2d 103, we set forth certain rules applicable in the construction of deeds. As we said in *Yuscavage v. Hamlin,* 391 Pa. 13, 16, 137 A. 2d 242: "Among such rules are those providing: (1) that the nature and quantity of the interest conveyed must be ascertained from the instrument itself and cannot be orally shown in the absence of fraud, accident or mistake and we seek to ascertain not what the parties may have intended by the language but what is the meaning of the words; (2) effect must be given to *all* the language of the instrument and no part shall be rejected if it can be given a meaning; (3) the language of the deed shall be interpreted in the light of the subject matter, the apparent object or purpose of the parties and the conditions existing when it was executed." By an application of these rules to the construction and interpretation of *Arnold Executors'* deed, considering fully the executors' petition to the Orphans' Court and the order of that Court, it is crystal clear that both Arnold's personal representatives and the court which directed the sale contemplated that *all* Arnold's interest in realty located in Clearfield County was to be

conveyed and that no severance of the natural gas rights was intended. The petition to the court, the court order and *Arnold Executors'* deed all contemplated a conveyance of *all* the rights and interests, including natural gas but excluding that which was conveyed in the grants to Byrne and Hall-Kaul, which Arnold had acquired through the *Richey* deed. Even the strict construction applicable to judicial proceedings dictates the same result.

The *Arnold Executors'* deed effectively conveyed to Thompson all the rights which Arnold had acquired under the *Richey* deed, with the exception of such rights as were conveyed by the *Byrne* and *Hall-Kaul* deeds. Thompson, in turn, conveyed all his rights under the *Arnold Executors'* deed to Penfield by the *Thompson-Penfield* deed. While the expressed purpose of the *Penfield Quitclaim* deed was to correct certain portions of the *Arnold Executors'* deed, a scrutiny of that deed clearly reveals that it was understood by and intended by Arnold's trustees that Penfield acquire *all* Arnold's interest in and under the land in question. Penfield, by these successive conveyances, acquired title to all the natural gas rights which Arnold had once owned and the Arnold group has presently no rights whatsoever to the natural gas under Parcels 1, 2, 3 and 4.

### The Penfield Group Claim

The court below found that the Penfield group was the present owner of the rights to the natural gas solely upon the theory that L. W. Smith, receiver of Penfield, had neither requested nor received from the U. S. District Court any authority to sell and convey to the Commonwealth of Pennsylvania any rights to natural gas. Inter alia, the court below stated: "It is, there-

fore, obvious that the Receiver requested authority to sell only surface lands, and received authority only to sell surface lands, and consequently did sell only the surface lands.

. . .

"In the absence of any authority in the Receiver to sell any minerals whatsoever, they must remain in the Penfield Coal and Coke Company, and become available to the plaintiff trustee, and the creditors whom he represents."

L. W. Smith, in the capacity of receiver, had no authority to sell Penfield's realty except upon the order of the court and he could sell only that which the court directed: 45 Am. Jur. §§389, 391, pp. 306, 307. Such a sale by a receiver is a judicial sale to which the doctrine of *caveat emptor* applies: 45 Am. Jur. §402, pp. 312, 313.

Penfield's argument is that in the body of the receiver's petition for the sale "wild surface lands" and "surface lands" were mentioned thirteen times and the prayer of the petition mentioned "wild surface lands" twice, making fifteen instances wherein surface was mentioned; that the petition averred that the Commonwealth was interested in "wild surface lands that are suitable for forestry development" and "that among the real estate owned by [Penfield] there are about 3784.35 acres of wild surface land without mineral rights which the company owns in fee, subject to the above recited liens"; that the price of $2.90 per acre did not reflect an adequate consideration for the transfer of oil and gas rights; that the area had not been proven for gas and oil and that throughout the proceedings the only reference was to surface lands.

The background of this particular phase of the litigation is most significant. Penfield, in grave financial difficulties and unable to be operated successfully, was forced to liquidate its assets to meet, if possible,

its obligations. The purpose of the receivership proceedings was to make available for the payment and satisfaction of Penfield's creditors not *some* but *all* of Penfield's assets. The only reservation in the *Commonwealth* deed was of "the coal, fire clay, limestone, iron ore and other minerals that had been heretofore sold and conveyed to third parties", [i.e. *Byrne* and *Hall-Kaul*]. The *Commonwealth* deed further recited: "It is the intention of [L. W. Smith, receiver] to convey by this indenture *all* his rights, title, and interest and *all* the right, title and interest of [Penfield] in, to and upon the above mentioned warrants". (Emphasis supplied). The amount of money which the receiver finally realized from the sale of Arnold's Elk County and Clearfield County realty was consumed in the payment of taxes, expenses, costs and fees. No money remained available to liquidate the large mortgage against Penfield and its properties and to pay other creditors. Under these circumstances it is absurd to construe this judicial proceeding as resulting in a sale only of the surface of the land and not of any rights thereunder, including natural gas. Had Penfield's receiver and the U. S. Court contemplated or intended that the sale was to effect a severance of the natural gas rights from the surface of the land, why then was the receiver discharged by the court while the value of such natural gas rights remained undisposed of and creditors remained unpaid even in part? Neither Penfield nor any representative on its behalf at any time during a quarter of a century ever claimed title to these natural gas rights. It is clear beyond any question that the purpose of the receiver's petition to sell was to divest *all* Penfield's interest in the premises, gas rights as well as surface, and the court so decreed; the *Commonwealth* deed vested in the Commonwealth title to *all* the rights which Arnold had acquired under the *Richey* deed, save those which Arnold had conveyed

to *Byrne* and *Hall-Kaul.* Nothing in the present record indicates that either the receiver or the court ever contemplated that the Commonwealth deed effected a severance of the surface from the natural gas rights. *Yuscavage v. Hamlin,* 391 Pa. 13, 137 A. 2d 242, is apposite. In *Yuscavage,* supra, where the owners of two tracts of land, with the exception of the coal thereunder, conveyed "All the surface and right of soil" of the two tracts and the habendum clause, very similar to the recitation in the *Commonwealth* deed, recited "And also, all the estate, right, title, interest . . . of the grantors", we held that such language conveyed title to the oil and gas under these tracts of land. Like the deed in *Yuscavage,* supra, the *Commonwealth* deed conveyed all the interest of the grantor [Penfield's receiver] in the premises, including the natural gas rights, excepting only that which had been conveyed previously by Penfield's predecessors in title. An examination of the *Commonwealth* deed, read in conjunction with the judicial proceedings which authorized and approved the conveyance, clearly shows that Penfield intended to convey *each and every* interest which it had, save such as had been previously conveyed; no severance of the natural gas rights was ever contemplated by the parties.

The court below was in error in its conclusion that Penfield retained any title to the natural gas rights under this tract. The Commonwealth, beyond any doubt, is the present owner of all of the natural gas rights under Parcels 1, 2, 3 and 4.

Decree reversed. Costs to be divided between the appellees and all of the appellants, except the Commonwealth of Pennsylvania.

Mr. Justice BELL dissents.

Mr. Justice McBRIDE took no part in the consideration or decision of this case.

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

In this case mineral rights were conferred through the medium of the following language: "All the coal, coal oil, and all other minerals of every kind and character in, under and upon."

I assert that this phraseology conferred on the grantee the rights to the natural gas in and on the property involved because, (1) *"every kind and character"*[*] is expansive enough a phrase to include natural gas; and (2) the grantor intended gas to be included therein. The Majority Opinion finds a way to say that when the grantor said "all other minerals of every kind and character," he did not intend to include natural gas. Is gas not a mineral? From time immemorial the substantive world has been divided into three kingdoms; the animal, vegetable and mineral. If gas is excluded from the mineral kingdom, where does it go? It cannot move into the animal or vegetable kingdom. Does it float about, a pariah to all kingdoms, or is a new kingdom being founded for its exclusive occupancy? And does this mean that the world must now be re-divided into four kingdoms, instead of three?

In *Silver v. Bush*, 213 Pa. 195, at 197 (1906) we said: "Of the fact that under the broad division of all matter into the three classes of animal, vegetable and mineral, *petroleum and gas are minerals,* there has never been any room for question, and even under some more restricted classifications the same result may be reached." Are we abandoning this solid promontory of logic, reason, and common sense? If we are, I can only say that once you depart from the moorings of good, clear understandable English and embark on the sea of unrestrained interpretive expression, anything is possible—but that is not the way to decide a lawsuit,

---

[*] Italics throughout, mine.

especially where property rights are involved—property rights which have been documented by deeds, mortgages, and incontestable court records.

Let us now look at the facts in this lawsuit and endeavor to determine what caused the Majority to move to a conclusion which, as I see it, is entirely illogical and wholly insupportable. On June 25, 1900, N. T. Arnold of Clearfield County obtained title in fee simple from I. F. Richey et al. to four tracts of land comprising 3784.35 acres. On the same day he obtained title from the same Richey et al. to mineral rights in fifteen other tracts of land. The mineral rights in these other fifteen tracts were conveyed in the following language: "All the coal, coal oil, fire clay and other minerals of every kind and character." The deed also contained this illuminating provision: "It is the intention of the grantors herein to convey to the said N. T. Arnold all the land, coal, coal oil, fire clay, *natural gas* and other minerals and all rights vested in said grantors."

Thus, this provision quite clearly established that Arnold obtained title to the natural gas in the fifteen tracts (which are not here at issue). Nor is it questioned that he acquired the gas rights in the four tracts here involved since his title to these tracts was a fee simple one. The question is who *now* owns the gas rights in those four tracts.

On June 25, 1900, that is, the same day that Arnold obtained the four tracts and the fifteen other tracts, he conveyed to John F. Byrne the rights to: "All the coal, fire clay, limestone, iron ore and other minerals in and under" in two of the four tracts.

A month later he conveyed to K. P. Hall and Andrew Kaul "All the coal, coal oil, and all other minerals of every kind and character in, under and upon" the other two parcels of the four mentioned.

Later on, the New Shawmut Mining Company, one of the party contestants in this case, acquired all the

rights which Byrne and Hall and Kaul (hereinafter to be referred to as Hall-Kaul) had in these four tracts. It is admitted by everyone in this lawsuit that New Shawmut got whatever Byrne and Hall-Kaul had.

It is my considered judgment that the New Shawmut Mining Company, under the language already quoted, obtained indefeasible rights to the natural gas underlying the four tracts. But the Majority says that New Shawmut did not get title to the natural gas, arguing that: "Arnold's omission of natural gas, coupled with the variation in the delineation of the minerals expressly conveyed to Byrne and Hall-Kaul, indicates that Arnold did *not* intend to convey *all* the mineral rights he had received from Richey et al. (Emphasis in Majority Opinion)."

In other words, when Arnold said: "all other minerals of every kind and character," he did not mean all other minerals of every kind and character. Also, that when he enumerated certain minerals and then added "and other minerals in and under," he did not mean to include natural gas in "other minerals in and under."

Let us see if Arnold did not intend to include natural gas in the all-embracive language he used in conveying his mineral rights in the four tracts. We have seen that he made the first conveyance of mineral rights in two of the four parcels of land on June 25, 1900, the same day that he had received the mineral rights in the fifteen tracts. In this conveyance he had accepted the word "gas" as a mineral and had contracted with respect thereto on that basis. Why would not the term "mineral" in the deed *from* him to Byrne not be given the same meaning it was given in the deed *to* him? Especially when the latter deed shows that the Byrne deed was already in contemplation of the parties, since it makes specific reference to it as follows: ". . . excepting such interest as was heretofore

conveyed . . . to John Byrne, Trustee as of this date." In fact, the deed to John Byrne was recorded before the deed to Arnold.

Since these two deeds (the one to Arnold and the one from Arnold) were warp and woof of the same transaction, can the word *mineral* be given one interpretation in one conveyance and another meaning in its twin conveyance? In *Silver v. Bush,* supra, cited by the Majority Opinion with enthusiastic approval, this Court said: "The crucial question . . . is what was the sense in which the parties used the word." In what sense could Arnold, Byrne and Hall-Kaul use the word mineral except to include natural gas, in view of the specific language to that effect in the Richey deed conveying the mineral rights to Arnold? Let us see further how Arnold regarded the deeds in which he conveyed mineral rights to Byrne and Hall-Kaul in June and July, 1900. He lived six years after these conveyances. During those years he did not attempt to sell the natural gas rights to anyone nor did he indicate in any manner that he had withheld the rights to natural gas from the grant of "all other minerals."

Arnold died August 4, 1906, insolvent. His personal representatives petitioned the Orphans' Court of Clearfield County to sell all his property for payment of debts. A Schedule "C", listing all Arnold's properties, was attached to the petition. This schedule described Arnold's rights in the four tracts as *"surface only."* One of Arnold's personal representatives incidentally was his widow, who had been a co-grantor in the deeds to Byrne and Hall-Kaul. If anyone would know the intention of Arnold when the mineral rights were conveyed to Byrne and Hall-Kaul, it would be she. She recognized that *all* mineral rights had been conveyed to Byrne and Hall-Kaul, thus leaving to Arnold and herself only the surface rights in the four tracts. Accordingly, the formal document describing

Arnold's rights in the four tracts specified "Surface Only."

And more. The orphans' court approved the sale of the "surface only" in the four tracts to one **B. F. Thompson** who naturally could only receive what the court approved, namely, surface only.

If the intention of the parties is to be the touchstone to determine whether gas is to be regarded as a mineral or not in the transaction under consideration, it would be difficult to conceive of more convincing proof that Arnold intended to pass the natural gas rights in the four tracts to his grantees than the fact that his representatives, including his wife, recognized that Arnold had already conveyed "all" the minerals to Byrne and Hall-Kaul and that, therefore, "surface only" was left in their title to the four tracts, which is all they listed as their assets, insofar as these four tracts are concerned.

However, not only does the Majority reject this clearest proof of recognition of past conveyance of mineral rights by Arnold, but it goes further and says that although the petition described Arnold's title as "surface only," and although the court approved the sale of "surface only", and although the deed in pursuance of the order of court conveyed "surface only" to B. F. Thompson, the gas rights were nevertheless included in the petition and authorized for sale by order of court and conveyed to B. F. Thompson! This must be known as the theory of inclusion by exclusion.

And how does the Majority explain the phenomenal conclusion indicated? It says: "Even though the descriptions of Parcels 1, 2, 3 and 4 were prefaced as 'surface only', yet Arnold's personal representatives both in their petition and attached schedule, did represent to the court that they had listed *all* of Arnold's interest in realty in Clearfield County. . . ." (Emphasis in original).

Thus, the Majority argues that although Arnold's representatives specifically declared *what* their rights were in the four tracts, this meant nothing since they said they were going to sell all their property—and someone else decided for them that they still had what they had already conveyed away. Of what use is a schedule in a formal court authentication if, through an ex parte proceeding, the schedule may be altered, mutilated, and nullified?

If we follow the Majority's reasoning in this phase of the case to its logical conclusion we will find that a dangerous precedent is being established. It will mean that no one, looking over the record of court authenticated sales, can now be certain of what was actually sold because, although a schedule specifically enumerates what has been sold, there is always the possibility that a later court in an entirely different and independent proceeding may declare the schedule added to, subtracted from, or completely nullified.

Thus, according to the Majority, although Thompson's deed gives him the "surface only" to the four tracts, he in fact received the subterranean rights as well. Of course, this reasoning on the part of the Majority is all ex post facto, because no one, while the property rights were being transferred, could have foreseen or imagined what this Court is now deciding.*

Some nine months later, on February 23, 1910, Thompson sold his rights to the Penfield Coal and

---

* The fact that between the descriptive and habendum clauses of the deed to Thompson there appeared: "Together with the right and privilege of entering upon such lands as are not conveyed and being described herein and taking away said coal, coal oil, natural gas, fire clay and other minerals of every kind and character," cannot enlarge the interest conveyed in the body of the deed, namely, "Surface only." Such clauses are merely used for the purpose of granting easements appurtenant to the rights already granted, that is, to give rights of egress, regress and ingress to secure the minerals already granted.

Coke Company. Obviously, Penfield could not receive more than Thompson had to sell, and Thompson could not have had more than he obtained from Arnold's representatives, and the representatives could only have inherited what Arnold had left to them, namely, surface rights only.

A year or so after Penfield became owner of the surface rights only in the four tracts, an error was discovered in the deed from Thompson, and a correcting deed, referred to also as a quitclaim deed, was made up by the Arnold trustees, directly to Penfield. Although the Majority regards this quitclaim deed as assuring to Penfield the gas rights underlying the four tracts, Penfield itself acted all the time on the assumption and belief that it had only surface rights to the land. On March 1, 1910, in a mortgage to the Guarantee Title and Trust Company, by which it expressly undertook to place in trust *all* of its property, real, personal and mixed and *all* rights, privileges and franchises of the Company, in order to secure $700,000, Penfield described its rights in the four tracts only as "*surface.*" Nor did it make any changes in this mortgage after the correcting deed had been executed. Even Penfield's own map of its holdings, introduced in evidence in this litigation, and dated 1920, showing the acreage here involved, marked its rights in the acreage as "surface" alone.

In 1926 Penfield found itself in serious financial difficulties and the United States District Court for the Western District of Pennsylvania appointed one L. W. Smith as receiver to handle its affairs. Smith petitioned the court to sell the four tracts of land here involved. He described Penfield's property rights in these lands as "wild surface lands in fee *but without mineral rights.*" Along the whole lengthening chain of title to these lands, after the Byrne and Hall-Kaul deeds, we find continuous and constant reference to

rights in the lands as "surface" only. The interpretation placed upon all the conveyances by the parties themselves speak louder than the strained construction adopted by the Majority which not only defies the expressed intention of the parties but construes the terms to mean the exact opposite of what they say.

When Smith, the receiver of the Penfield properties, petitioned the United States District Court for authority to sell Penfield's interests, he specifically and expressly limited Penfield's ownership to the wild surface land only. In the clearest of language he said:

"14. That among the real estate owned by the Penfield Coal & Coke Company there are about 3784.35 acres of *wild surface land without mineral rights* which the company owns in fee, subject to the above recited liens.

"15. That the said *surface lands* are of a rough and mountainous character, are not now productive and never were productive to the company. That the said *surface lands* were never used by the Penfield Coal & Coke Company and are not either useful or necessary to carry on *coal mining operations* on these properties, if at any time such operations should be resumed. The annual local taxes assessed against the said surface lands amount to about $500.

"16. That the department of Forests and Waters of the Commonwealth of Pennsylvania is desirous of acquiring the said *surface lands*. . . . .

"17. That the said *surface lands* referred to in the said contract with the Commonwealth of Pennsylvania are bounded and described as follows. . . ."

Throughout Paragraphs 18, 19 and 20, Smith's reference to the Penfield's land was always "surface lands." In his prayer he requested to be authorized to sell "3784.35 acres of wild surface land in fee but without mineral rights, as hereinbefore described. . .". The court granted the prayer in the petition.

And then, after the sale had been consummated, the receiver filed his report and return of sale, in which he said: "2. That by order of your honorable court entered June 2, 1931 the Receiver was authorized to offer at public sale to the highest bidder four certain tracts of *wild surface* land . . ."

In Paragraph 4 of the report, the receiver states that the highest bid received for the "wild surface land" was that of the Commonwealth of Pennsylvania, Department of Forests and Waters, and that, therefore, the "surface land" was sold to the Commonwealth, the sale having been conducted strictly in accordance with the order of the court.

The court then confirmed the sale of 3784.35 acres of "surface lands" to the Commonwealth, authorizing the receiver to deliver a deed "for the said surface lands" upon payment of the purchase money. And thus the fateful four tracts of land without mineral rights became the property of the Commonwealth. And upon this showing, the Majority comes to the conclusion that the Commonwealth received the rights to the natural gas in the land! In arriving at this astonishing conclusion, the Majority makes no effort to explain how it is that in all of the 57 years which elapsed between the granting of the mineral rights to Byrne and Hall-Kaul (which rights now belong to the New Shawmut Mining Company) and the initiation of this lawsuit, the only ones who paid taxes on the minerals were Byrne and Hall-Kaul and the New Shawmut Mining Company.

The Majority Opinion, I am sorry to say, is an aggregation of contradictions. Although it says, not once, but many times, that the test in determining whether gas is included in the term mineral is to be decided by the intention of the parties expressed and implied, it has completely ignored the expression of

the parties expressed in countless ways, as only briefly enumerated by me in this Dissenting Opinion.

It is a melancholy fact in history that many a tribunal, having once concluded that it has reached a correct result, becomes unconcerned about the manner in which it justifies its decision. In such attempted justification inconsistency does not worry, illogical conclusions do not distress, unfounded premises are treated as of no consequence. Since it assumes that the capstone is correct, it does not matter how much straw is stuffed into the pyramid to support the apex.

For instance, the Majority here argues that Byrne and Hall-Kaul could not have obtained or even wanted the natural gas rights in the four tracts. It says that: "The mining of coal, not the recovery of natural gas, was the principal objective of the Byrne and Hall-Kaul conveyances; in fact, John Byrne's principal duties as trustee were in connection with the recovery of coal." But I respectfully suggest that the test of principal objective is no test at all in arriving at the proper decision in this case. If we would apply this principal objective test to the other conveyances we have encountered in the chronology of title we would have to ask: Was it the principal objective of N. T. Arnold to recover gas, yet no one questions that he received the gas rights in the original conveyances. Was it the principal objective of Penfield Coal and Coke Company, which was in the coal and coke business, to recover gas, yet the Majority held that Penfield obtained title to the gas in the property. Was it the principal objective of the Commonwealth's Department of Forests and Waters to gather up gas? What does the Department of Forests and Waters have to do with the recovery of natural gas? And yet the Majority has given title to the gas to the Department of Forests and Waters.

In order to arrive at the conclusion reached by the Majority, one must find that practically everyone in-

volved in writing conveyances, drafting court orders, preparing documents and presenting exhibits desired to mock the English language, make sport of rules of grammar, distort the meaning of the simplest words, and ignore the sequence of cause and effect. Thus, if the Majority conclusion is to be accepted as law, we must find that when Arnold said "minerals of *every kind* and *description*," he did not mean every kind and description. We must find that when Arnold's personal representatives said "surface rights alone" they really meant surface and sub-surface rights. We must find that when the orphans' court used the words "surface rights," they did not mean only the surface, on which there is no gas but the inner strata as well where there is gas. We must find that when Thompson conveyed "all of the surface" to Penfield, he really · meant all of surface and all of the subterranean terrain as well. We must find that when Penfield described its rights in the tracts as "wild surface lands," it meant not only the wild land above the surface, but the wild natural gas beneath. We must find that when the receiver of Penfield petitioned the United States District Court to sell the "wild surface lands but *without* mineral rights," he really meant wild surface lands but *with* mineral rights. We must find that the United States District Court in granting the petition in the words of the receiver intended to go beyond what was requested, what was intended, and what was legal. We must find that when the receiver sold the land to the Commonwealth, Department of Forests and Waters, and reported to the court that he had sold only the wild surface land that he really did not mean what he said, that he was misrepresenting matters to the court, and that he really sold the wild surface land and the wild, uncontrolled natural gas beneath. And we must find that although the Commonwealth's Department of Forests and Waters was only interested in buying the

wild surface land it was forced to accept the natural gas for which it has no use and with which as a Department of the Commonwealth's government it is not required to cope.

We must do all these things, which deride the purpose of language, are cynical of the dictionary, do violence to logic, upset court decisions, and, worst of all, establish a precedent which will puzzle the learned, confuse the unlearned, and introduce into the law of real estate a quality of instability as fugacious as the natural gas which is the subject of this lawsuit.

Since I am not prepared to go along with such plethora of paradox, I must, and do, dissent.