## United States Steel Corporation v. Hoge

*Robert M. Keener, Sayers, King, Keener, & Nalitz, Thomas R. Wright,* and *Reed, Smith, Shaw & McClay,* for plaintiff.

*Michael E. Kusturiss, Louis Salamon, R. Wallace Maxwell, Maxwell & Davis,* and *Samuel L. Rodgers,* for defendants.

*Michael W. Burns,* and *Dickie, McCamey & Chilcote,* for Halliburton Company.

TOOTHMAN, *P.J.*, May 4, 1978—United States Steel Corporation filed suit in equity against the owners of a tract of 258 acres of land situate in Franklin Township, Greene County, Pa., Mary Jo Hoge and Jessie Lee Cowan and Harvey C. Cowan, against the lessee of the oil and gas under the tract, Mary L. Cunningham, and against the drilling contractor, Halliburton Company. Defendant, Halliburton Company, has been discharged by agreement of the parties at a conference of all counsel, its position as a drilling contractor not being deemed relevant to the issue involved. The complaint contains two counts: the first being an action to quiet title to the methane gas located in, around or as part of the Pittsburgh vein of coal which, it is claimed, is owned by plaintiff, and the second being an action for a permanent injunction against defendants to prevent them from exploring, capturing and removing the methane gas located in and about the Pittsburgh coal seam.

Defendants responded with preliminary objections in the form of a demurrer, in which they contend the methane gas is not owned by plaintiff, and is, in fact, still owned as part of their surface title, its transfer not having vested in the owner of the coal seam by reason of the transfer of title of the coal and accompanying mining rights as to the first count, and the failure of plaintiff to exercise its statutory remedy under the Gas Operations Well-Drilling Petroleum and Coal Mining Act of November 30, 1955, P.L. 756, 52 P.S. §2101 et seq., as to the second count.

The preliminary objections were argued on February 21, 1978, at which time, by stipulation, the court temporarily restrained any further exploration for recovery of methane gas by defendants, and

contemporaneously prohibited plaintiff from engaging in any mining operations in the coal seam under the tract in dispute, both conditions imposed to protect the parties during the course of this litigation.

Accordingly, the consequence of the pleadings and arguments to this point is to place before the court the initial question, acknowledged to be of vital and far-reaching import, which is who owns the methane gas, or at least, preliminarily, whether there is sufficient merit in plaintiff's claim of ownership to continue the temporary injunction and order a full hearing. It is a highly intriguing, especially complex question, one that has never been given judicial introspection before, and one also which carries with it an almost immeasurable economic impact in these days of critical energy considerations. It is quite obvious that as our nation's fuel needs have expanded and the supply of fuel for energy in any form has become more distant and precious, such a question would eventually force its way to the attention of the court, which, in its traditional role, must delineate and clarify such an ownership for the stabilization of both the landowners' and the coal owners' rights. Thus, in this county, with now only a modest oil and gas production capacity in the usual sense still alive, nevertheless, its vast coal deposits in different seams and in different stages of production, made it predictable that an early need for a determination of such claims would surface in this court.

There is a strange irony in the very fact that the question arises through a claim of its ownership by a coal company, since, until the energy crisis has forced new concepts and new initiatives upon the industry, methane gas has long been regarded as

the lethal enemy of coal, and of all coal mining operations. Far from capturing and controlling it, the industry has historically done everything possible to waste it, and thus rid itself of its scourge in deference to safe mining. Heretofore, the only consideration in the industry has been the utilization of many millions of dollars and countless manhours of effort to clear the active mine of its deadly contamination. But now with its potential for capture, containment and sale, we find that the industry is reexamining its position to see if while ridding the mines of its poison, at the same time, the erstwhile "poison" can be turned to making lights burn, cars move, and homes heated. It could well be that this long-time curse of coal will now become one of the better known, more useable and beneficial byproducts of its recovery.

In any event, with the change of economic conditions, the development of science, and the aid of increased geological data, the elusive enemy of mining is now being embraced with an enthusiasm such as was in ancient times saved only for the return of the prodigal son, and we must therefore advance further the legal rules which must apply to that return in order that it may be settled as to whom the ownership of this "enemy" belongs, and who, in the last analysis, has the right to prepare for its welcome. In the case of Chartiers Block Coal Co. v. Mellon, 152 Pa. 286, 25 Atl. 597 (1893), at p. 294, the Pennsylvania Supreme Court made this interesting observation dealing, at that time, with the right of the owner of the surface to drill through the Pittsburgh coal seam to recover the natural gas in the sands below:

"This is a new question and one that is full of

68

difficulty. The discovery of new sources of wealth, and the springing up of new industries which were never dreamed of half a century ago, sometimes present questions to which it is difficult to apply the law as it has heretofore existed. It is the crowning merit of the common law, however, that it is not composed of ironclad rules, but may be modified to a reasonable extent to meet new questions as they arise. This may be called the expansive property of the common law. . . The comparatively recent development of the sciences of geology and mineralogy, and the multiplication of mechanical devices for penetrating the earth's crust have greatly changed the uses and values of lands . . ."

In the judicial probing of this perplexing question we shall start at the place where the present rules of law are well settled, and long accepted. Plaintiff, by reason of a deed to its predecessor in title, acquired title to the fee to the Pittsburgh or River, or Nine Foot vein of coal under the land. The vein is located around 870 feet below the surface. Along with conveyance, there was the conveyance of the mining rights, in very much the standard or usual form found in such deeds, this language applicable to 242 acres of the total tract:

"Together with all the rights and privileges necessary and useful in mining and removing of the said coal, including the right of mining the same without leaving any support. . . , the right of ventilating and drainage and of access to the mines for men and materials. . . , the right of drainage and transporting the coal of other lands through the mines and openings."

The mining rights with respect to the other 15 acres contained much the same language, and an

added paragraph reserving to the owner the right "to drill and operate through the said coal for oil and gas without being held liable for damages." This clause merely conforms to the holding of the court in the Chartiers case cited supra.

The lease for oil and gas from the present surface owners to one of the defendants, Mary L. Cunningham, grants to her: ". . . all of the oil and gas and all of the constituents of either in and under the land, hereinafter described, together with the exclusive right to drill for, produce and market oil and gas and their constituents and of storing gas of any kind in any formation underlying the land. . . "

Thus, in the present state of the law, and the commonly understood rules as they now exist, there have been created two separate owners of the two separate strata underneath the Hoge property. Clearly the owner of the coal seam owns all of it, together with the right to mine, use and consume it. The lessee of the oil and natural gas owns that deposit wherever located, in and under the whole of the tract, together with the right to drill for it, use and consume it. See Dunham and Shortt v. Kilpatrick 101 Pa. 36 (1882); Highland v. Com., 400 Pa. 261, 161 A. 2d 390 (1960); Silver v. Bush, 213 Pa. 195, 62 Atl. 832 (1906); Preston v. South Penn Oil Co., 238 Pa. 301, 86 Atl. 203 (1913); Brookbank v. Benedum-Trees Oil Co., 389 Pa. 151, 131 A. 2d 103 (1957).

This presently well-recognized identity of a separate owner of the coal seam, and the oil and gas, offers, in our opinion, no help in determining the answer to the present question, which is initially whether methane gas is of such a composition as to be scientifically, geologically and chemically included in the generic phrase or classification of

natural gas, or whether it is such a substance as is so closely akin to, or perchance is even such an intergral part of the coal in a geological and chemical sense that it compels us, of necessity, to consider it separate and apart from what are or have been commonly understood to be the natural gases which traditionally have been found in the earth's lower strata in certain sand or rock formations. Indeed, the answer to this first question is of primary importance, before the court can say with any degree of logical assurance that it is owned by either the coal company or the oil and gas lessee. As we view the matter, we are drawn of necessity to hold a hearing where testimony of the most skilled and scientific nature can be presented, by geologists, chemists, engineers, or from other related sciences, who can pinpoint with as much accuracy as the present state of our knowledge will allow, in such a fashion as to prove or disprove to what category or classification methane gas belongs. If it is of such a nature or characteristic that it can and does exist completely separate and apart from the coal, and the extraction of it does not disturb, diminish or detract from the ownership and control of the coal, it could well be then that it requires but an extension of the commonly established determination of the ordinary ownership of natural gas. If, on the other hand, it is such a substance which "lives" only in the coal seam and is of such an integral and intrinsic part of it as to be, in reality, an essential ingredient of the coal seam itself, then, it could be found to belong to the owner of the coal in which it is regularly housed. In the area of natural gas as it has been heretofore known, the owner of the gas has never pressed, nor probably has had reason to press for ownership of the sand, shale or rock formations

in which it was found, but in that instance, there has never been any indication but that, while the gas is located in those formations, it is not, in a direct sense, produced by them, as would appear to be true of methane gas, which, at the very least, appears to be wedded to and nourished by the coal seam itself, even if it is not actually produced by the source.

Both plaintiff and defendants have dealt extensively with the Pennsylvania Attorney General's opinion on this subject, rendered October 31, 1974, 4 Pa. Bull. 2400, citing therein the case of Westmoreland & Cambria Natural Gas Co. v. De-Witt, 130 Pa. 235, 18 Atl. 724 (1889), which case speaks of oil and gas as "minerals ferae naturae" (we always thought this concept applied only to wild game) and notes that " 'their fugitive and wandering existence within the limits of a particular tract is uncertain.' " The case concludes by stating "they [the oil and gas] belong to the owner of the land, and are part of it, so long as they are on or in it, and are subject to his control." As to the holding in this case, we do not find it to be controlling of the issue now before us. It is dealing with natural gas as the substance has long been identified. And the Attorney General's opinion is only that, and not an adjudication of this issue. Certainly, there was no testimony before him as to the essential nature of the substance in question, and while his opinions are entitled to be given consideration, they are binding on no one.

Neither do we find, as defendants argue, any light or judicial direction on the subject here at hand in the Gas Operations Well-Drilling Petroleum and Coal Mining Act, 52 P.S. §2101 et seq. As the title implies, it is a legislative control mech-

anism for the allowance of mining of coal and drilling for oil and gas to be done simultaneously, compatibly and safely, and contains nothing to aid us in determining the definition and ownership of methane gas. While depending upon the final adjudication of this case, the act may ultimately be construed as requiring that an application for drilling for methane gas shall specifically state the type of gas sought to be recovered, to put owners of the coal seams on notice of the possible penetration into their area of dominant control. For, if eventually it is decided that methane gas is such a type of substance as to be considered the same as natural gas, and therefore as being owned by the surface owner, the usual right of drilling through a coal seam to reach the gas below, which is fully protected by the Gas Operations Act, is not the same circumstance as a coal owner finding that suddenly the gas operator is hydrofracturing his coal seam to release the methane gas at or about the same time he is starting to mine it.

We finally perceive that the preliminary objections are not sufficiently weighted with merit that the issue can or should be resolved at this stage of the pleadings. It will be still fraught with many complexities and difficulties after a full hearing is had on the subject, but until that is held, and the several parts of the question are more fully and technically explored, it would be less than prudent for the law on the subject to become prematurely crystallized.

## ORDER

And now, May 4, 1978, the preliminary objections are dismissed, and the matter directed to be set for hearing on the merits. During the course

of the pendency of the legal proceedings being prosecuted before the court, it is ordered that there shall be a continuation of the observance of the preservation of the status quo as to mining and drilling by all parties hereto. This opinion and order herein made is also applicable to the companion case at 691 in equity.