2015 PA Super 184

| | |
|---|---|
| ALBERT M. VOSBURG, III,<br><br>Appellee<br><br>v.<br><br>NBC SEVENTH REALTY CORP., AND PITTSTON AREA INDUSTRIAL DEVELOPMENT CORP.,<br><br>APPEAL OF:  NBC SEVENTH REALTY CORP. | IN THE SUPERIOR COURT OF PENNSYLVANIA<br><br><br><br><br><br><br><br><br><br>No. 1552 MDA 2014 |

Appeal from the Order entered June 3, 2014,
in the Court of Common Pleas of Luzerne County,
Civil Division, at No(s): 91-E-2002

BEFORE:  BOWES, DONOHUE, and ALLEN, JJ.

DISSENTING OPINION BY ALLEN, J.:             **FILED SEPTEMBER 02, 2015**

I respectfully dissent from the Majority.

The trial court, in its December 3, 2010 order, recounted the factual and procedural background of this case as follows:

> [] The Complaint was filed [by Vosburg] in Equity to the above-captioned number on October 11, 2002 as a case in trespass, and conversion of the mineral rights held by [Vosburg]. [Appellant and PAID] hold title to the surface rights of the parcel of land located in Pittston Township.  However, [Vosburg] claims the rights to the alleged "Mineral Estate" retained by a reservation clause contained in Deed dated May 11, 1951 and recorded in Luzerne County Deed Book 1115, page 221. Although the title to the property has eventually passed to [Appellant and PAID], The Mineral Rights Reservation Clause has remained in [Vosburg's] family with no subsequent conveyance by Deed of said reservation.  An unrecorded 1976 Bill of Sale purportedly conveying said Reservation of Minerals Rights has

been renounced and thus the mineral rights remain in [Vosburg] by alleged intestate inheritance.

[PAID] received the surface right[s] to the property by Deed in 1999 [from the Estate of Michael Fritz]. Said Deed contained a standard subject to all reservations, restrictions … exceptions, etc. clause which thereby incorporated the Mineral Right[s] Reservation Clause of the 1951 Deed. On February 27, 2002, [PAID] transferred the property to [NBC] by Deed which contained the same "subject to" clause. After the 2002, transfer, [Appellant] initiated a large construction project on the property for industrial development. The construction necessitated the excavation, processing and refill and grading of hundreds of thousands of tons of rock found on the site both on and under the surface of the property in question to a depth of approximately fifty (50) feet.

[Vosburg's] complaint alleges trespass to the Mineral Rights reserved by [Vosburg] and conversion of the rocks by [Appellant's] removal, processing, and use of the processed rocks and sub-base and fill. The extent of [Vosburg's] monetary damages attendant to the alleged trespass and conversion is <u>not</u> before the court.

Trial Court Opinion, 12/3/10, at 1-2 (underline in original).

The initial 2002 complaint which the trial court referenced provides in pertinent part:

5. The Abstract of title to the property conveyed to PAID by the Fritz Estate Deed (the "Fritz Parcel Chain of Title") reveals that the mineral rights in the Fritz Parcel were previously excepted out and retained by Albert M. Vosburg and Katherine N. Vosburg, his wife, by virtue of their deed to Anthony Fritz dated May 11, 1951 and recorded on May 12, 1951 in Luzerne County Deed Book 1115, page 221 (the "Vosburg to Fritz Deed") which deed contains the following language: "EXCEPTING AND RESERVING all coal and other mineral beneath the surface of said described land, with the right to mine and remove the same by subterrane mining." []

7. [Vosburg] is the grandson of Albert M. Vosburg and Katherine N. Vosburg[.]

- 2 -

8. [PAID] conveyed to [Appellant] a parcel of real estate (the "PAID Property") which includes a portion of the Fritz Parcel, said portion being approximately 50 acres in size, along with other adjacent lands by that certain deed dated February 27, 2002 and recorded on March 1, 2002 in Luzerne County Deed Book 3002, page 57046 (the "PAID to [Appellant] Deed")[.]

9. To the best of [Vosburg's] knowledge, [Appellant] began excavating hardened shale[1] from the Fritz Parcel on or about January 15, 2002, first under a Right of Entry granted to [Appellant] by PAID and then as the owner of a portion of the Fritz Parcel for the purposes of leveling by cutting and filling the area needed for [Appellant's] land development project as approved by the Luzerne County Planning Commission involving the construction of a 1,010,180 square foot warehouse distribution facility and offices on 105.12 acres of land (the "Warehouse Distribution Facility Land Development") and to provide a suitable sub-base for the buildings, loading docks, parking areas, and access drives which are part of the Warehouse Distribution Facility Land Development Project.

10. To the best of [Vosburg's] knowledge, [PAID] has also excavated hardened shale from the Fritz Parcel, or plans to do so in the near future, to use as a suitable sub-base for the construction of an access road to serve the remainder of the Fritz Parcel and other lands owned by PAID.

11. At all times relevant to this complaint [Appellant and PAID] did not have or obtain the rights to remove minerals from the Fritz Parcel and the mineral rights in and to all minerals within the Fritz Parcel remained of record with Albert M. Vosburg and Katherine N. Vosburg[.]

12. At all times relevant to this complaint [Appellant and PAID] knew, or should have known from the deeds recorded in the public records of the Office of the Recorder of Deeds in and for Luzerne County, Pennsylvania, that they did not own any mineral rights in the Fritz Parcel and, therefore, had no right to excavate and use for their own benefit the hardened shale located in the Fritz Parcel.

_____

[1] The parties have also referred to the disputed material as "rock," and/or "sandstone" throughout their pleadings and briefs.

13. The hardened shale located in the Fritz Parcel and removed and converted to the use and benefit of [Appellant and PAID] was at all times and is today a mineral as defined under Pennsylvania law.

14. The hardened shale had and has a minimum value of in excess of $3.00 a ton.

15. [Vosburg's] predecessor in interest, Burr B. Vosburg, sent a specimen of rock excavated from the Fritz Parcel to the United States Department of the Interior, Bureau of Mines in 1938 and received a determination letter stating the mineral composition of the rock to be hardened shale (the "Bureau of Mines Letter"), a copy of which letter is attached hereto and incorporated herein as Exhibit F.

16. [Appellant] has excavated and converted to its use and benefit well over one million tons of hardened shale with a minimum approximate value of $3,000,000.00.

17. [PAID] has excavated and converted to its use and benefit an unknown quantity of hardened shale with a minimum approximate value of $3.00 per ton.

18. [PAID] has also benefitted from [Appellant's] excavation and conversion of hardened shale from the Fritz Parcel as the presence of the hardened shale on the Fritz Parcel increased the purchase price received by PAID from [Appellant] for the entire property sold in so far as [Appellant] took into account in formulating the purchase price for the PAID real estate the savings to it of not having to purchase and truck the necessary minerals to the building site.

19. [Vosburg] and [his] predecessors in interest to the mineral rights in the Fritz Parcel have in the past, prior to the purchase of the Fritz Parcel by PAID, excavated and removed hardened shale from the Fritz Parcel by surface excavation and mining for resale and for their own use.

Complaint, 10/11/02, at 1-3.

The above-referenced correspondence from the United States Department of the Interior Bureau of Mines provided in pertinent part:

Dear Mr. [Burr B.] Vosburg:

- 4 -

In reply to your letter of April 30, with which you sent a specimen for determination:

The specimen is hardened shale and besides aluminum silicates contains a little lime carbonate and a little mica. It probably varies somewhat in composition from place to place and the lime carbonate especially may vary.

Yours faithfully,

John W. Finch,

Director

Correspondence, 5/18/38.

In preliminary objections to Vosburg's 2002 complaint, Appellant averred, *inter alia*, that "[Appellant], as the owner of the property, owns the surface of the land and, as the 'surface owner,' retains all rights to the minerals other than coal that are located in the portion of the ground between the coal seam and the surface." Preliminary Objection[s] of [Appellant] to [Vosburg's] Complaint, 12/2/02, at 2 (unnumbered).

In reply to Appellant's preliminary objections, Vosburg averred:

6. Denied. [Appellant] went far beyond its legal right to use the surface of its property when it excavated by blasting hardened shale, a mineral, to a depth in excess of fifty (50') feet and processed the hardened shale by means of a portable rock crusher brought onto the Fritz Parcel into various products including but not limited to shot rock, various grades of manufactured stone such as pipe bedding, 2B gravel, 2B modified stone, and Nos. 3, 4, and 5 stone used for rock lined drainage ditches.

\*\*\*

9. [Vosburg's] predecessors in title to the mineral rights had entered into the Fritz Parcel by way of a Township Road which cut through the Fritz Parcel as shown on the Luzerne County Tax Maps, a copy of the relevant portion of which is attached hereto

and incorporated herein as Exhibit 'A', and had conducted open pit quarrying of hardened shale located upon the Fritz Parcel before and after the conveyance of the surface of the Fritz Parcel.

[Vosburg's] Answer to [Appellant's] Preliminary Objections, 1/15/03, at 2. Vosburg subsequently filed an amended complaint, which incorporated, *inter alia,* the foregoing averments regarding his predecessors' entry onto the Fritz Parcel for quarrying purposes using the township road referenced above. **See** Amended Complaint, 1/15/03, at 4 (unnumbered). On June 11, 2003, Vosburg filed a third amended complaint, which *inter alia*, added additional plaintiffs.

In its answer and new matter to Vosburg's third amended complaint, Appellant "denied that it excavated and converted to its use hardened shale in any significant amount from the Fritz Parcel." Appellant's Answer and New Matter [to Vosburg's Third Amended Complaint], 7/1/03, at 6. Appellant further "denied that the hardened shale has a minimum value of in excess of $3.00 a ton. To the contrary, the value of hardened shale in place is a small fraction of $3 per ton." **Id.**

On June 10, 2010, Vosburg moved for partial summary judgment. **See generally** Vosburg's Motion for Partial Summary Judgment, 6/10/10. In granting summary judgment in Vosburg's favor and against Appellant, the trial court explained:

> There are two questions presented to the Court[.] The first centers on the interpretation of the Mineral Rights Reservation of the 1951 Deed and its relationship, of any, to 'rock'. Secondly, if the Court finds said 'mineral' rights

applicable to 'rock,' is the processing of the rock and refilling and grading the subsurface of the land with the processed rocks a 'conversion'[?]

The Mineral Rights Reservation Clause of the 1951 Deed reads as follows:

'... all coal and other mineral beneath the surface of said described land with the right to receive and remove the same by subterranean mining[.]' (emphasis added).

A 'mineral' is defined as follows:

'a naturally occurring, inorganic, crystalline solid with definite chemical composition and characteristic physical properties.' *Environmental Science, a Global Concern,* 9th Ed., by William C. Cunningham, Mary Ann Cunningham and Barbara Woodsworth Saigo.

The Courts of the Commonwealth have defined 'mineral' in various cases as including stone and rock [***Hendler v. Lehigh Valley R.R. Co.***, 58 A. 486 (Pa. 1904)] and everything not of the mere surface. [***Highland v. Commonwealth of Pa.***, 161 A.2d 390 (Pa. 1960)]. Upon review of these cases and the geological textbook definition, the Court finds rock to be a mineral.

Taking the Downey Declaration submitted by [Appellant and PAID], the … operation included extensive excavation ('cut and fill') of 482,364 cubic yards, embankment work, regarding and filling. The description clearly was well beyond 'surface' work on the parcel. Further, the Downey Declaration confirms that the 'rock' was crushed and processed into a different form and the new form of rocks was used as fill. [Appellant and PAID's] excavation activities even required bringing onsite an additional 12,800 cubic yards of off-site fill in order to re-establish the terrain at the surface. The excavation, processing and refilling of the parcel described by [Appellant and PAID's] expert indicates a clear trespass of the Mineral Rights Reservation by [Vosburg].

As to the question of conversion by [Appellant and PAID], the term 'conversion' has been defined most recently in the <u>Paves v. Corson</u> case [765 A.2d 1128 (Pa. Super 2000)] as:

'the deprivation of another's right of property in, or use or possession of a chattel without the owner's consent and without lawful justification.'

[Appellant and PAID] argue that the rock found on site remains on site albeit displaced and leveled and used as fill. However, the processing and crushing of the rocks themselves as described by Downey is a deprivation of [Vosburg's] use or possession of the chattel (rock) itself. [Appellant and PAID] have transformed the nature and species of the various rock boulders. The rocks in their original non-processed, non-fill state could have had various other uses for [Vosburg] (e.g. walls, stabilizing support, etc). [Appellant and PAID] have completely possessed the rocks transforming them into fill for [Appellant and PAID's] uses (industrial site development) and thereby deprived [Vosburg] of the use or possession of the rocks themselves.

Trial Court Opinion, 12/3/10 at 2-4.

Following the trial court's issuance of its December 3, 2010 order, our Supreme Court published its opinion in **Butler v. Charles Powers Estate,** 65 A.3d 885, 898 (Pa. 2013), ruling that in interpreting private deed reservation clauses within the ambit of oil and gas actions, natural gas would not be considered a mineral because it was "non-metallic [in] nature." On March 11, 2014, relying on **Butler**, Appellant moved to vacate the trial court's December 3, 2010 order, and for summary judgment in Appellant's favor.

As succinctly summarized by Vosburg:

[A]s part of the briefing in advance of the trial court's 2014 order, [Vosburg] submitted affidavits from … Albert M. Vosburg Jr. and [Vosburg] stating the following evidence of the parties to the deeds' intention that the reservation encompass:

1) that the grantor herein, Albert M. Vosburg, owned a stone quarry in the immediate neighborhood of the Fritz Parcel and

sold stone produced from this quarry [FN3: This quarry is referred to in the chain of title as the 'Bown quarry,' *see* deeds attached to Albert M. Vosburg Jr. Affidavit at R. 482a-484a.]; *See* Exhibit A, Second Affidavit of Albert M. Vosburg, Jr. at 114-12, R. 474a-475a. *See also* exhibit B thereto, deed establishing that Albert M. Vosburg owned the Bown Quarry Property from 1913-1969.

2) that Albert M. Vosburg actually employed Anthony Fritz in this stone quarry and had him sell stone as part of his employment duties; *See ld.* at ¶¶ 14-17, R. 476a.

3) that Albert M. Vosburg offered Anthony Fritz the surface of the Property for $5,000 and the Property with no mineral or rock reservations for $10,000. *See Id*. at ¶¶ 14-16, R. 476a. Because Mr. Fritz sold stone for Albert M. Vosburg, both parties understood that the same stone found in the neighboring quarry was likely under the Fritz property. *Id.*

4) Mr. Fritz and Albert M. Vosburg understood that the stone had commercial value because they both sold the stone to the Borough of Avoca. *Id*. at ¶¶ 12-17, R. 476a.

Vosburg's Brief at 5-6.

The trial court heard arguments on Appellant's motion for summary judgment on May 27, 2014. On June 3, 2014, the trial court denied Appellant's motion to vacate its prior order and for summary judgment; the trial court granted summary judgment to Vosburg. Following this Court's September 18, 2014 order granting review of the trial court's order, Appellant filed a timely notice of appeal.

Appellant's issues on appeal concern the trial court's determination that the term "mineral" within the private deed reservation clause includes rock. In reviewing Appellant's claims, I recognize that:

In construing a deed or a contract, certain general principles must be kept in mind. First, it is the intention of the

parties *at the time of entering in thereto that governs*, and such intention is to be gathered from a reading of the entire contract[.] *Philip Morris & Co. v. Stephano Bros.*, 1938, 331 Pa. 278, 200 A.2d 605; *Maxwell v. Saylor,* 1948, 359 Pa. 94, 58 A.2d 355. In addition, "Contracts must receive a reasonable interpretation, according to the intention of the parties at the time of executing them, if that intention can be ascertained from their language. (Citing cases). Where the language of a contract is contradictory, obscure, or ambiguous, or where its meaning is doubtful, so that it is susceptible of two constructions, one of which makes it fair, customary, and such as prudent men would naturally execute, *while the other makes it inequitable, unusual, or such as reasonable men would not be likely to enter into, the interpretation which makes a rational and probable agreement must be preferred*. [FN1: Emphasis ours] If one construction would make it unreasonable, while another would do justice to both parties, the latter will be adopted[.]" *Percy A. Brown & Co. v. Raub,* 1947, 357 Pa. 271, 287, 54 A.2d 35, 43. It is also beyond controversy, that a written document must be construed most strongly against the parties drafting it[.] *Cities Service Oil Co. v. Haller,* 1958, 393 Pa. 26, 142 A.2d 163. It is equally well fixed in the law that a doubtful reservation or exception in a deed will be construed most strongly against the grantor and in favor of the grantee[.] *Bundy v. Myers,* 1953, 372 Pa. 583, 94 A.2d 724; *Sheffield Water Co. v. Elk T. Co.*, 1909, 225 Pa. 614, 74 A. 742. This rule applies with special force to a reservation or exception which amounts to cutting down of the grant[.] *Klaer v. Ridgway*, 1878, 86 Pa. 529.

*** 

[] Further, the standard of interpretation to be applied is the meaning that would be attached by a reasonably intelligent person, *acquainted with all operative usages, and knowing all the circumstances prior to and contemporaneous with the making of the contract*[.] Restatement, Contracts § 320; *Clearfield Development Corp. v. Devonian Co.,* 1956, 385 Pa. 248, 122 A.2d 718.

**Wilkes-Barre Tp. School District v. Corgan,** 170 A.2d 97, 98-99 (Pa. 1961).

Initially, I find that Appellant's reliance on **Butler** is misplaced.  **Butler** addresses private deed reservations of mineral rights, specifically natural gas, within *an oil and gas* agreement, which is inapposite to the scenario before us.  The pronouncements of the Supreme Court in **Butler** reiterated that under Pennsylvania law, *natural gas and oil* are presumptively not minerals due to *their* non-metallic nature, and are thereby presumptively excluded from the term "mineral" within private deed reservation clauses.

Specifically, the Supreme Court in **Butler** explained:

> **The [trial] court noted that Pennsylvania law has long recognized a rebuttable presumption that "if, in connection with a conveyance of land, there is a reservation or an exception of 'minerals' without any specific mention of natural gas or oil, ... the word 'minerals' was not intended by the parties to include natural gas or oil."** *Highland,* 161 A.2d at 398 (citing *Dunham,* 101 Pa. at 44).  **This precept, commonly known as the *Dunham* Rule, may be rebutted by a challenger through clear and convincing evidence that the intent of the parties, at the time of the conveyance, was to include natural gas and/or oil**.  *Id.* at 400.  The trial court finally stated that the notion that natural gas and oil are not, for purposes of private deed transfers, considered minerals is "entrenched" within Pennsylvania law. *See* C.C. Marvel, Annotation, *Oil and gas as "minerals" within deed, lease, or license,* 37 A.L.R.2d 1440, at *3.
>
> ***
>
> The [*Highland*] Court … recognize[ed], as did its predecessors, that mankind generally divided all known matter into three categories—animal, vegetable, and mineral—and that petroleum and natural gas are unquestionably minerals under that broad categorization. *Id.* at 398.  Nonetheless, we reaffirmed that for deed reservations we must assume, absent evidence to the contrary, that mineral is a term of "general language, and presumably is intended in the ordinary popular

- 11 -

sense which it bears among English speaking people," *i.e.,* metallic substances and not oil and gas. *Id.* **Thus, the *Dunham* Rule, a well-established and relied upon rule of property, continues to bind all situations in which a deed reservation does not expressly include oil or natural gas within the reservation.** *Id.* at 398–99. Indeed, such a conclusion was demanded by the long-standing jurisprudence of this Commonwealth concerning property law: "A rule of property long acquiesced in should not be overthrown except for compelling reasons of public policy or the imperative demands of justice." *Id.* at 399 n. 5 (quoting, *e.g., Smith v. Glen Alden Coal Co.,* 347 Pa. 290, 32 A.2d 227, 234 (1943)).

\*\*\*

We thus turn to the continuing viability of the *Dunham* Rule, and we reaffirm that the rule continues to be the law of Pennsylvania. [] Notwithstanding this Court's recognition that various statutes, such as the Municipalities Planning Code, categorize natural gas as a mineral, as [a]ppellants aptly note, we recently reiterated that **"Pennsylvania common law has applied a rebuttable presumption in the context of a private deed conveyance that the term 'mineral' does not include oil or gas."** *Huntley,* 964 A.2d at 858. **We see no reason, nor has any party or court provided us with one, to depart from this entrenched rule.**

\*\*\*

The *Dunham* Rule is clear, dating back to *Gibson,* that the common, layperson understanding of what is and is not a mineral is the only acceptable construction of a private deed. **Notwithstanding different interpretations proffered by other jurisdictions, the rule in Pennsylvania is that natural gas and oil simply are not minerals because they are not of a metallic nature, as the common person would understand minerals.** *Gibson,* 5 Watts at 41–42; *see also Dunham,* 101 Pa. at 44. The *Highland* decision made clear that the party advocating for the inclusion of natural gas within the deed reservation (here [a]ppellees) bears the burden of pleading and proving by clear and convincing evidence that the intent of the parties who executed the reservation was to include natural gas. 161 A.2d at 398–99. Critically, however, such intention may only be shown through parol evidence that indicates the

intent of the parties at the time the deed was executed—in this case, 1881. *Id.*

Of course, in 1881, the law of Pennsylvania was *Gibson* and *Moore, supra* pp. 889–90, which clearly stated two overarching principles: (1) anything of a non-metallic nature would not be considered a mineral for private deed purposes; *Gibson,* 5 Watts at 41–42; and (2) when interpreting private deeds and contracts, the "question is to be determined not by principles of science, but by common experience directed to the discovery of intention." *Moore,* 2 Whart. at 493; *see also Gibson,* 5 Watts at 44. Both of these principles have been adopted and utilized by the courts implementing the *Dunham* Rule. Accordingly, to the extent the Superior Court ordered an evidentiary hearing with expert testimony concerning Marcellus shale natural gas, and the scientific nature thereof, such an order violated the *Dunham* jurisprudence. **Simply put, natural gas is presumptively not a mineral for purposes of private deeds**.

*Butler,* 65 A.3d 885, 886-898 (Pa. 2013) (footnotes omitted) (emphasis supplied). Accordingly, *Butler* is not applicable, and I reject Appellant's assertion that a reading of *Butler* supports vacating the trial court's December 3, 2010 order or reversing the trial court's June 3, 2014 order.

Rather, I find that *Butler* reiterates the well-settled precept that the interpretation of the "coal and other mineral" clause within the private deed at issue here is "to be determined not by principles of science, but by common experience directed to the discovery of intention." *Butler,* 65 A.3d at 898. In engaging in a "discovery of intention," I acknowledge that "[w]hile it is true that a reservation or exception in a deed will be construed against the grantor, it is equally true that this reservation and exception must be taken into account when attempting to interpret the deed as a whole and glean the intention of the parties therefrom." *New Charter Coal*

- 13 -

***Co. v. McKee,*** 191 A.2d 830, 835 (Pa. 1963) *citing* ***Wilkes-Barre Township,*** 170 A.2d at 99.

In analyzing the phrase "or other mineral" vis á vis sand, our Supreme Court determined that sand was excluded in the following scenario, and explained:

> The first question presented by this case is whether the sand, the taking of which is the trespass sued for, is a mineral, within the meaning of the deed between the parties. **In the broadest sense, as belonging to one of the three great divisions of matter—animal, vegetable, and mineral—sand, of course, is a mineral. In the more restricted scientific sense, sand may or may not be a mineral, according to what it is composed of.** In the language of mineralogists, air and water are minerals, while granite and similar rocks are not minerals, but aggregations of minerals. So it is of sand. It may be wholly of grains of silex or other mineral, or it may be of several mixed together, and therefore in the technical sense only grains of rock. It is perfectly clear that the parties here did not use the word 'mineral' in either of the foregoing senses. The first grantor with whom we are concerned, the Northern Coal & Iron Company, conveyed the land to Jumper, reserving 'all coal and other minerals, in, under and upon said land'; Jumper conveyed to defendant with a similar reservation; and the subsequent deed by defendant to plaintiff conveyed the 'surface' of the land, 'excepting and reserving as fully and entirely as in the said [preceding] indenture is excepted and reserved, and further excepting and reserving all the gravel necessary for any fill or ballast for the railroad,' etc. If the word 'mineral' had been used in either of the senses already mentioned, it would, as a matter of course, have included gravel, and the additional special reservation of the gravel shows that the parties did not consider it as included in the preceding general reservation. **But there is another, and what may be called the commercial sense, in which the word 'mineral' is used, and in which, having reference to its supposed etymology of anything mined, it may be defined as any inorganic substance found in nature, having sufficient value, separated from its situs as part of the earth, to be mined, quarried, or dug for its own sake or its own specific uses. That is the**

**sense in which it is most commonly used in conveyances and leases of land, and in which it must be presumed that it was used by these parties in the deed in question. 'Coal and other minerals'—the expression used—indicate substances which, like coal, have a value of their own, apart from the rest of the land, sufficient to induce the expense and labor of severance for their own sakes. These the grantor intended, and expressed the intention, to except from his grant and reserve to himself. While coal was the principal and perhaps the only thing clearly in view, yet the reservation was not meant to be limited to that, for then the addition 'and other minerals' would be superfluous and misleading. A vein of fine marble would clearly be reserved, and so, probably, if near enough a market to have a value, would be granite or limestone, or other building material, potter's or porcelain clay, and the like.** Sand might or might not be in this category. A vein of pure white quartz sand, valuable for making glass or other special use, would be within the reservation, while common mixed sand, merely worth digging and removing as material for grading, would not be. The referee has found that the sand which is the subject of the present contention was of this latter character, and was taken and used, not for any intrinsic value or use of its own, but as part of earth and other material to fill up the roadbed to the proper grade. So regarded and used, it was not within the reservation.

*Hendler v. Lehigh Valley R.R. Co.,* 58 A. 486, 487 (1904) (emphasis supplied).

Appellant states that *Hendler* was overruled by *Hall v. Delaware, L & W, R & Co.,* 113 A. 669, 670-671 (Pa. 1921). *See* Appellant's Brief at 20. However, a close reading of *Hall* reflects that the Supreme Court did not overrule *Hendler's* analysis of the term "mineral," nor did they overrule *Hendler's* requirement of an examination of the deed's language, the intent of the parties as expressed therein, and the attendant circumstances to the

- 15 -

deed's execution, prior to including a disputed mineral within a reserved mineral estate.

Indeed, in **Silver v. Bush,** 62 A. 832 (Pa. 1906), the Supreme Court emphasized that "[t]he variations in the scope of the word [mineral] arise from the connection and application in which it is used," and the "cardinal test of the meaning of any word in any particular case is the intent of the parties using it." **Id***.* at 833-834. Specifically, the **Silver** Court explained:

> The crucial question here, as in all contracts, is, what was the sense in which the parties used the word? Mineral is not *per se* a term of art or of trade, but of general language, and presumably is intended in the ordinary popular sense which it bears among English speaking people. It may in any particular case have a different meaning, more extensive or more restricted, but such different meaning should clearly appear as intended by the parties. A very recent discussion of the subject was had in *Hendler v. Lehigh Valley R. R. Co.,* 209 Pa. 256, 58 Atl. 486, 103 Am. St. Rep. 1005, where it was shown that while the word 'mineral' has a very broad meaning, already alluded to, and also a more restricted scientific use, it has also a commercial sense, in which it is most commonly used in conveyances and leases of land, and in which it may be presumed to be used in such instruments. In that sense it may include any inorganic substance found in nature having sufficient value separated from its situs as part of the earth to be mined, quarried, or dug for its own sake or its own specific uses. But, though it may include all such substances, it does not necessarily do so. Appellant cites the case as authority for the view that whatever comes within the terms of that description must necessarily be included under the word 'mineral.' But this is an untenable inference. Th[e] [*Hendler*] decision announced no new principle, nor any departure from the line of previous decisions. As already said, there is no discrepancy in the cases. **The cardinal test of the meaning of any word in any particular case is the intent of the parties using it, and all that *Hendler v. R. R. Co.* did was to apply that test to the word 'mineral' in the deeds on which the case turned. The substance there in question was sand, and it was shown that it might or**

> **might not be within the definition of mineral in the commercial sense, according to the circumstances and the intent of the parties.**

*Silver v. Bush,* 62 A. at 833 (Pa. 1906) (emphasis supplied).

Citing **Hendler** and **Silver**, the United States District Court in the Western District of Pennsylvania recently reasoned in ***PAPCO, Inc. v. U.S.,*** 814 F.Supp.2d 477 (W.D. Pa. 2011)[2]:

> In the analysis of whether a substance is a "mineral" within the scope of a mineral reservation, the crucial question is: "What was the sense in which the parties used the word?" *Silver v. Bush,* 213 Pa. 195, 62 A. 832, 833 (1906); *see also Highland v. Commonwealth,* 400 Pa. 261, 161 A.2d 390, 398 (1960). [] A mineral has been defined broadly as "everything not of the mere surface, which is used for agricultural purposes; the granite of the mountain as well as metallic ores and fossils, are comprehended within it." *Griffin v. Fellows,* 81 1/2 Pa. 114, 1873 WL 11950, *9 (Pa. 1873). It can also be defined by evidence of the parties' knowledge of the type of minerals present on the land at the time of conveyance. *See Gibson,* 1836 WL 2957 at *5, 7 (Court stated "it appears ... that both parties ... came to the knowledge of the fact that the mineral called chrome ... was found on this tract," and combined with the language of the deed, the Court found that chromate was included within the mineral reservation).
>
> A mineral may also be defined in the commercial sense, in which a mineral is "any inorganic substance found in nature, having sufficient value, separated from its situs as part of the earth, to be mined, quarried, or dug for its own sake or its own specific use." *Hendler v. Lehigh Valley R.R. Co.,* 209 Pa. 256, 58

---

[2] "While 'federal court decisions do not control the determinations of the Superior Court,' whenever possible, Pennsylvania courts 'follow the Third Circuit [courts] so that litigants do not improperly 'walk across the street' to achieve a different result in federal court than would be obtained in state court." **Parr v. Ford Motor Co.,** 109 A.3d 682, 693 n.8 (Pa. Super. 2014) (*en banc)* (internal citations omitted).

A. 486, 487 (1904) (*overruled on other grounds* by *Hall v. Delaware, Lackawanna & W. R.R. Co.,* 270 Pa. 468, 113 A. 669 (1921)). When the parties intend to define minerals by its commercial sense, substances included within this definition have their own value that is apart from the rest of the land. *Hendler,* 58 A. at 487.

The [*Hendler*] court went on to further state that such substances as granite, limestone, clay, and other building material would also be within a mineral reservation if they had a commercial value. *Id.* Therefore, since the sand did not have any commercial value, the court ruled that the parties did not intend to include the sand within the mineral reservation. *Id.*

As in *Hendler,* the language in the Jamieson Deed indicates the parties' intention to include as "minerals" substances that have their own value apart from the land. *Hendler,* 58 A. at 487. The Jamieson Deed reserved "all the oil, natural gas, glass sand and minerals of every kind and description whatsoever." Jamieson Deed at 439. The specific reservation of oil, natural gas, and glass sand indicates that the parties intended that substances that have commercial value are within the scope of the reservation. *Hendler,* 58 A. at 487. Thus, the critical question is whether "sandstone" has commercial value and is included within the mineral reservation of the Deed.

Unlike the sand in *Hendler,* sandstone located in the Allegheny National Forest has its own commercial value apart from the land. Sandstone was regarded as a commercially valuable mineral at the time of the conveyance of the Jamieson Deed. *Pennsylvania's Mineral Heritage: The Commonwealth at the Economic Crossroads of Her Industrial Development* (1944), Attachment 10 to Ex. A to Pl.'s Br. Supp. (noting longstanding stone industry in Pennsylvania, including "1.4 million tons of sandstone ... produced ... for commercial purposes" in 1930, the same year the Jamieson Deed was executed, at 50–51, and commercial use of sandstone for highway construction, at 156, 193). The parties of the Jamieson Deed were likely aware of the commercial value of sandstone, and that sandstone was present on the Jamieson Tract. As such, we find that since the parties to the Jamieson Deed intended to include commercially valuable minerals within the mineral reservation, and because sandstone was regarded as a commercially valuable mineral at the time of the Jamieson Deed conveyance, sandstone is within the scope of

the mineral reservation of the Jamieson Deed. Therefore, the sandstone at issue in this case belongs to PAPCO.

**PAPCO, Inc. v. U.S.,** 814 F.Supp.2d at 477.

Here, applying the cardinal test emphasized in **Silver** to the instant deed, and mindful of the sound rationale espoused in the **Hendler** and **Papco** decisions, I find that the challenged rock was reserved within Vosburg's mineral estate, and I would affirm the trial court's interpretation of the term "mineral" within the deed's reservation clause as inclusive of rock. **Hendler,** 58 A. at 487 (material would "clearly be reserved" where it had its own value as "building material," and "sufficient value separated from its situs as part of the earth to be mined, quarried or dug for its own sake or its own specific uses," and not just as a common material which was moved superficially to fill and regrade the land); **see also Papco,** 814 F.Supp.2d at 495 (material was a reserve mineral where the material was "a commercially valuable mineral at the time," where parties to the deed "were likely aware of the commercial value of" the material, that "[t]he challenged material" was present on the [land,]" and where the "parties to the [deed] intended to include commercially valuable minerals within the mineral reservation"). The phrase "*coal and* other mineral" within the deed's reservation clause signifies the intent to reserve commercially valuable assets. Deed, May 11, 1951, at 1 (emphasis supplied). There was documented knowledge well before the execution of the 1951 deed that rock was present on the property's surface and subterraneously. **See**

Correspondence, United States Department of the Interior Bureau of Mines, 5/18/38.

In **Hendler,** the fact finding referee determined that the disputed sand was not a reserved mineral because it was "merely worth digging and removing as material for grading" which was "part of the earth … to fill up the roadbed to the proper grade" without "any intrinsic value or use of its own." **Hendler,** 58 A at 487. By contrast in this case, and as recognized by the trial court, the rock has value and use of its own. As pled by Vosburg, the rock was the subject of open pit quarrying by Vosburg's predecessors. **See** Complaint, 10/11/02 at 3; Amended Complaint, 1/15/03, at 3-4. While Appellant denied that the rock at issue was hardened shale or even as valuable as pled by Vosburg, Appellant nonetheless conceded, in the alternative, that there was some value to the rock. **See** Appellant's Answer and New Matter [to Vosburg's Third Amended Complaint], 7/1/03, at 6 (Appellant "denied that the hardened shale has a minimum value of in excess of $3.00 a ton. To the contrary, the value of hardened shale in place is a small fraction of $3 per ton."). Moreover, the rock had value as building material, and was "extensive[ly] excavat[ed]" by Appellant for such purpose down to approximately 50 feet below the ground. **See** Trial Court Opinion, 12/3/10, at 3-4; **see also Hendler**, **supra** (categorizing a material as a mineral in the commercial sense, if it had "value" as a "building material … and the like"). I agree with the trial court that the "rocks in their original non-processed, non-fill state could have had **various other uses for**

- 20 -

**[Vosburg] (e.g. walls, stabilizing support, etc).**" Trial Court Opinion, 12/3/10, at 4. Therefore, I would affirm the trial court's determination that the challenged rock was reserved within Vosburg's mineral estate.

In sum, I would affirm the trial court's June 3, 2014 order which denied summary relief to Appellant and which declined to vacate the December 3, 2010 order granting summary judgment to Vosburg.